Good morning, your honors. My name is Eric Carl Spangenberg. For the record, I am a plaintiff. I'm also one of the attorneys of record in this particular matter. I wanted to submit to the court with the court's approval a appellant's notice of recent decision of the United States Supreme Court. We have a little form that you can fill out called Additional Authorities. It looks like this and the clerk can provide you a copy of that and after the argument maybe you can tell us which case you're referring to. Specifically Brown v. Legal Foundation of Washington. It's a U.S. Supreme Court case. We're familiar with that case. I had also sent a copy by fax and mail to the city. So with that, gone. Counsel, what was your, what's the point of the Brown case that you think is pertinent to your argument? The Brown case basically follows in a long line of cases delineating the thinking of the Ninth Circuit that was in bank. It was a taking case. The Brown case is a IOLA case. I-O-L-A? I can't even pronounce it. But it's, it was a trust fund case and though it was analyzed both at the Ninth Circuit, first with a three-judge panel and secondly in bank regarding whether the taking of trust fund monies and applying them as a state to determine would be appropriate, whether that was a taking. And I don't think it makes any sense for me to discuss what I interpret the case as. But I included that case because the analysis of the case both originally with a three-judge panel and then secondly with the in-bank panel, the Ninth Circuit discussed takings. And more specifically, I addressed it because in that particular case, Armstrong versus the United States, which was a case that I had cited to be specific, that's 364 U.S. 40, was a case cited where a lien was destroyed eliminating the possibility of a material supplier in a shipyard enterprise from collecting their monies that had been secured by the lien. And I think in this particular matter, Spangenberg versus et al. versus the city of San Jose, that the Armstrong case is very illustrative of certainly one of the lines of thinking in the case of the appellants in this particular matter. Maybe you can be more specific because the first issue we need to, you know, we characterize it as regulatory taking. And so we, that's certainly one aspect of it. And we look at the Supreme Court teachings on regulatory takings. But what I'm trying to understand is in terms of Williamson County and having a final decision from which we're really judging what happened, it's, I'm not quite sure how Brown applies. And maybe you can tell us because we're going to obviously go back and look at it again now in light of your argument. You might as well help us, you might as well point us there now instead of later. Well, my indication was the Ninth Circuit ruled in what was originally Washington Legal Foundation versus Legal Foundation of Washington and cited as authority both the majority and the dissent, the Armstrong case. And I believe that the Armstrong case is pivotal in understanding the appellant's claims as creditors. Briefly. You know, here's a couple questions on that then. So you're really at the first stage of standing in terms of whether you're here as a creditor or as an assignee, correct? I would submit, Your Honor, there are two distinct theories under which we seek recovery. And that in the district court, Judge White specifically ruled that we didn't have standing as creditors. Correct. And then went on to basically the standing as assignees. I believe that we, the appellants do have standing as creditors for the following reason. The underlying judgments which the appellants rely on for their position as creditors were prevented from being perfected against California agriculture, the party in bankruptcy. And we contend, the appellants contend that the city of San Jose, through their regulatory taking, diminished approximately $10 million in property value down to essentially nothing, whereby there was nothing available for recovery as a creditor of Cal Ag. But here's maybe a more basic question. I understand your theory and I understand your argument as to why it's a taking in your view. But I'm having trouble understanding the, is it Macedo or the judgment itself, the only judgment we actually have is against U.S. Agriculture, Inc. and McCready's? Is that how you pronounce it? Yes, McCready's. McCready's? Yes. So just as a legal matter, we don't have, where is the judgment that we look to, to look at you as a judgment creditor? Number one, the ability to obtain a judgment against Cal Ag, who was the property owner of the 36 acres which the appellants contend was taken by regulatory action, was prevented by an ongoing bankruptcy from March, I think it was March 14th, 1995, until July 31st. Here's the problem I have with it. It's kind of like a bootstrapping argument because you're basically saying, well, there was this taking and therefore it prevented me from perfecting my role as a judgment creditor. What's the authority for that? The statute of authority is that supposing back in 1995 when the appellants got their bankruptcy, they would have, I contend, also gotten judgments against California Agriculture, who was the property owner. But they didn't. I mean, the point is a lot of things could have happened, but it seems to me from a legal standpoint, these what ifs don't make you a judgment creditor. You in effect are asking us to say that you're tantamount to a judgment creditor because you could have been. Yes. Certainly that's a reasonable interpretation, Your Honor. Well, let me ask you a different question. Let's assume that you're not a judgment creditor just for talking purposes, but you are an assignee. How does that change your takings claim or your ability to recover on a takings claim? Well, the ability to recover on a takings claim would have been thwarted by the Ninth Circuit's position that one had to bring a claim under the Civil Rights Act which had a one-year statute of limitations. We contend as appellants that the statute of limitations should have been three or maybe even five years. The most recent regulatory ordinance that the City of San Jose put in place went into place November 3rd, 1998. It had a negative declaration filed, I believe, in March. It's in the brief. And because of that, we contend that the property brought no money to the sheriff's sale. Had the property been worth something like $10 million, it arguably could have brought maybe half of that, maybe even as much as three-quarters of that. But, Counsel, you concede, though, that our current precedent would bar your claim as untimely. Yes. Yes. I fully agree. Azula Pacific? Right. Pacific, right. And, you know, we can't do anything about that. In other words, as a three-judge panel, we're bound by that holding. Even if we disagreed with it, we can't do anything. I understand, Your Honor, but certainly you can appreciate that I have to make the argument. Right. And my point is I think you've made the argument in your brief on that point, so you've preserved it. But just appreciate that convincing us that the Ninth Circuit was wrong won't get either of us anywhere. Okay. We're all a big system. We try and make it better every day. Well, that's your facial challenge. What about your as-applied takings challenge? As-applied, I would contend that McCready's, who had assisted David on Holmes, the option or of the property back in like 1988 or 1989 to have basically applied for a significant development in excess of 100 units on both the lower property, which is a subject of this particular complaint, and there was a second contiguous property, and I believe it was 100 plus units on both, and my recollection was on the lower property by count, it would have been 59 specific units. Well, I would contend by the city's subsequent downzoning and this particular application for development standing in place, it was certainly meaningless or certainly fruitless to attempt to further apply to the city for a subdivision which contained 59 units after the city had downzoned it to 7 units. Counsel, that initial application, was that processed all the way through? Frankly, Your Honor, I was the attorney for Kellagg in representation unrelated to the processing of that, so I can only rely on what the city has put into the record as to what in fact happened, because I have no first-hand knowledge. The record reflects that that application was not processed through to the end. It certainly was not processed to a positive approval. Or negative, was it? I guess that that would be true, too. So when you talk about futility, I was trying to stick this into some legal theory. I presume that the city also has a variance process, so what happens in some of these cases is that you apply, and if you're getting denied, you also ask for a variance, and then that gets denied, and then you really have no more options. In other words, you're at the end of the road, and then it's time to figure out whether there's a taking. In this case, it seemed to me that we never had a final processing of the general application, nor did we have an application for a variance that was denied. Is that true? To the best of my knowledge, that is true. If I enter Williamson, the Supreme Court case, doesn't that require us to basically say on the as-applied challenge that it can't be brought because we don't have this final determination? Well, the appellants would contend that when it is absolutely fruitless or it is functionally impossible or futile to convince the city to, shall we say, up-zone property, that it has become futile, in fact, for a developer of any kind to attempt to do something that is clearly against the city's stated intent. But you see, I understand why you feel that way as a practical matter, but what I'm trying to figure out is that if you play that out, it would mean that in virtually every takings case we'd be in the Court of Appeals and we'd be trying to figure out, I wonder if it was futile, or I wonder if they might have changed their mind. You know, there's all kind of political and other issues that go on in municipalities. So how can the Ninth Circuit try to figure that out as a matter of law? Well, I will have to, in that particular regard, I prefer to stand on my written submissions and jump back to the claim as creditors because I think it is clear that as creditors one has absolutely no capability of submitting any kind of plan for any kind of development as a lien holder against a piece of property, and thereby you're completely constrained from basically satisfying what is the first prong of Williamson. And on that I see an orange light in front of me. I think I'm best to reserve the rest. Thank you, Your Honor. We'll hear from the city. My name is Joe DiCiccio. I'm a senior deputy city attorney with the City of San Jose. What I'd like to do is focus just on two issues here this morning, which I think are really dispositive of the case. And the first, actually the Court has brought up both of them already, and the first is lack of ripeness of the claim as an as-applied claim, the second being the expiration of the statute of limitations if this claim is viewed as a facial claim. As to the ripeness claims, we have a series of facts which were really not in dispute. Plaintiffs asked or made an application for PD zoning in San Jose in 1989, and some development plans apparently were submitted in 1990. As far as the city's records are concerned, these were the last submissions to the city for any form of property development on this property. Neither of those plans were at any point pursued to completion, and no official action on either of those plans, either for or against those plans, was ever taken by the City of San Jose. So in answer to the Court's earlier questions, no, the city never rejected the plans, and no, the city never accepted the plans. And does the city have a variance process? Yes, of course the city has a variance process. It's equally relevant, I believe, that these submissions that were made predate the general plan amendments, which are at issue, and the Geological Hazard Ordinance, which is here at issue by a number of years. And there have been no submissions since those particular land use controls were submitted. Clearly, as the Court has already referenced, under Williamson County, a final determination has to be made by the administrative agency. We have no final administrative determination here, and even under the Ninth Circuit's own precedent in the McKinsley case, which seems to require both a rejected development plan and the denial of a variance, we have neither of those factors at play in this case, which leads us right into the futility issue. And again, under the McKinsley case, the teaching is that an application for development is not futile unless there has been at least one meaningful application and one meaningful application for variance. And in that case, meaningful application is interpreted, as I recall, as an application pursued to completion with an actual final decision by the administrative agency, which, again, we do not have here. I want to point out one further thing as far as the futility exception is concerned. The arguments in the plan seem to indicate that somehow the city land use regulations for these properties taken as a whole make development impossible on the property. That is not the case. One must look at what the land use controls are in this case. The two land use controls at issue are, one, a general plan amendment. The function of the general plan amendment was not to prohibit residential development on the property. It was to reduce the total number of residential units which could be developed on the property. Therefore, the property clearly is still developable. The other ordinance in question was something called a geological hazard ordinance. The function of the geological hazard ordinance was to require a study before any residential development was ever actually commenced on the property to assure that, if I could use the vernacular, that the homes built would not slide down the hill. It was not put in place to guarantee that no homes ever be built on the hill, but simply that whatever construction that was ever built on that hill would be safe construction. So to say that the package of regulations have prohibited all development on this property would be incorrect from the start. Mr. Spangenberg has focused primarily on, at least initially, on the creditor status rather than the assignee status. And if the district court was wrong and, in effect, there was kind of a backhanded taking that prevented him from becoming a creditor, so he had creditor status, would that change at all the analysis under either the as applied or the facial challenge? I don't think it does, and that's why I jumped ahead to the ripeness and statute of limitations issues because, of course, we know that the district court in this case found that they did have standing as an assignee. So there was standing to bring the claim. Does standing additionally as a creditor change that? We don't believe it does. We have indicated in our briefness, unlike our position, that they are not judgment creditors and cannot become judgment creditors for a number of reasons, one being that the California judgment creditor statute requires that the judgment debtor own or control the property in question, and the simple fact that a governmental entity holds land use control authority over property does not, in our opinion under California law, convert their interest into ownership or control of real property. Thank you. As to the statute of limitations claim, I believe the arguments in our brief are relatively straightforward. The teaching of the Hensler case has been accepted, and a 90-day statute of limitations is, in fact, applied. It has been determined that bankruptcy filing does not toll that statute of limitations in terms of a facial challenge. The idea that a three- or five-year statute might apply is specifically contradicted by the Hensler case, which says that under California law, those three- and five-year statutes only apply in situations where there is no other specific statute which governs. And, of course, in our case, we have Government Code Section 6509 of California, which imposes the 90-day statute of limitations specifically. The Court has already this morning referred to the fact that the Azul Pacific decision will not be overruled by this Court, so I'm not going to go into that. And unless there are other questions, I'll leave it at that. I don't think there are any further questions. Thank you. Your Honor, in responding to a few things that Mr. DiGiugio has said, I think that it's important that the Court pay attention to CCP 708.210, which is the creditor lawsuit statute that we're relying on. It does specifically say in there, also, indebted to. And we contend that had we been able to, unfettered by bankruptcy, file a claim against the city and against Cal-Ag, there would have been money available on the basis of a taking suit against the city of San Jose. So, counsel, your theory is that the bankruptcy proceedings precluded you from initiating litigation? Correct. And so you didn't have the availability of lifting up the state for that limited purpose? The trustee in bankruptcy maintained the right to pursue the city until the very last, and in the record. Well, then, under what theory, then, are you saying that you could have sued the city if the trustee had the exclusive right to proceed against the city? Well, I am saying that had Cal-Ag not gone into bankruptcy, that we could have sued the city. And also have contended that... But to do that, you're saying that the only reason they went into bankruptcy was because of the taking? I mean... No. So there's no... I'm trying to understand why that gets you out. Frankly, James Matritis, who owned 100% of Cal-Ag, I certainly wasn't privileged to his thinking as to why he went into bankruptcy. I presume it was because he had more obligations than he had assets. Right. But see, what I'm still having trouble with is why you say, but if he hadn't, then we would have been in a different position. Well, if he had... So how could this court do anything about it? The point of the matter is that by him going into bankruptcy, we, as appellants, were precluded from pursuing a claim under the creditor lawsuit statute. And had he not gone into bankruptcy... So at the same time the city proceeds to enact regulations that are taking the assets of Cal-Ag, we are basically bound and tied by the bankruptcy laws. And so from that, we make the equal protection and due process argument that we were prevented from pursuing our claim by virtue of an ongoing bankruptcy. If the bankruptcy law said, if a company goes into bankruptcy, cities can't enact regulatory takings or any kind of regulation on land that a particular corporation, in this case, might own, it would be a different matter. Because then there would be no regulations that would prevent the property from getting the highest and best price at any kind of sale, whether it was a sheriff's sale or a trustee's sale. So counsel, your position is that who was indebted to the judgment debtor? That the city of San Jose was indebted to the judgment debtor? If there had been no litigation, no judgment, how was it indebted? The reason for the creditor lawsuit statute, as I understand it, is that when a judgment debtor does not act upon rights that they may have against third parties to collect money that could be used to pay judgment creditors, it allows the judgment creditors then to act in their own stead to attempt to, through the courts, collect money that would otherwise be unavailable to them. All right. Thank you. Unless there's anything else on it. No. The case of Stangenberg v. The City of San Jose is submitted.
judges: Ferguson, McKeown, Rawlinson